versus Hitech Pharmaceuticals et al. May it please the Court, my name is Jody Shalasi, and I represent Hitech Pharmaceuticals. I'm going to address the issue in this case regarding the application of the DeNovo statute. My co-counsel Ed Novotny will address the remaining issues. Could I ask you before you get into those issues, something that was raised in the 28J letter of the government. You had at least one bite at the apple with respect to these issues, and the case was decided in Georgia, and then the 11th Circuit just came down with an opinion that addressed all of these issues. How is there not issue and or claim preclusion here with respect to the issues you've raised? Sure, Your Honor. If you want to address this supplementally, that's fine. But if you have a quick answer that would help us get over that issue, that's fine. I think there's several reasons why it should not be precluded. The clock is not running over here. It will now. Okay. There you go. Sure, there's several reasons why. The first reason why is that the holding in the 11th Circuit is directly contradictory to holdings of this Court in the 3rd Circuit. In the 3rd Circuit, in the NBE case, in the NBE case, this Court said, and I quote from it, the Court's role under 342 is to decide in the first instance whether a dietary supplement is adulterated. The 11th Circuit went. Well, when there is no rule. That's what we addressed the issue in NBE only with respect to the fact that de novo happens in an enforcement action where there's no rulemaking. We did not reach the issue before us. We specifically left it open. I agree. You didn't have to. That's correct. That was not related to the issue that was before the Court. All right. So then how, I get back to my question, how is there not issue or claim preclusion? Well, again, I think the point of the matter is two things. There's the issue that when you have a situation where there is a regulation in play, and I think you go to the U.S. Hager case, the U.S. versus Hager appeal case that you brought to our attention, I think addresses that issue. I think what you have is a situation where in the Hager case, the Court asked the question of what is the force and effect of a regulation in a subsequent judicial proceeding. And the Court there, Supreme Court, said that you should give deference to that regulation unless there's a different statutory scheme in place, which is here. I'm not sure that I'm getting the drift of this as responsive to Judge Rendon's question. Sure. And I guess the point of the matter is that it can't be just grace judicata or collateral solvable to these issues because it's a different statute. It's a different statute that is in play. You have a statute that is specifically directing de novo review. Wait a minute. It's a different statute than was in play in the other high-tech case that's already been decided? No, Your Honor. It's the same statute. Same parties. Which issue that we have has not been resolved by another court? Which of the four issues that you have put before us? I think all of them, Your Honor. And the reason being is because you have, and I go back to the statute, the statute is calling for a product-by-product review, which is what the statute is calling for. And if it's a product-by-product review, the products that are issued in the 11th Circuit can be related to the products that are related to the 3rd Circuit that were seized here. So you're saying by virtue of a different nature of a forfeiture action, different boxes makes it a different case? Yes, Your Honor. All right. Maybe we better reserve this for supplemental briefing. I think so. But it is a huge issue that looms large, so we will want supplemental briefing on it. I appreciate that, Your Honor. I appreciate that. Alex, is that all right with you? Yes, absolutely. All right. Why don't you proceed with your? Sure. In this case, you have Section 342 expressly stating that the courts will decide any issue related to the issue of adulteration on a de novo basis. It is the court, not the FDA, that decides the issue of adulteration. So you're saying once there is a rule in place that says products containing this substance are adulterated, and the FDA has gone through total rulemaking, and you come in and want to challenge it based upon the DSHEA, we are then to become like the agency and look at everything all over again? Or a district court is. Yes. Actually, absolutely, like a district court. That's exactly what we're saying, Your Honor. What court do you cite? What opinion do you cite for that proposition? Because every court that's looked at it has said that's incorrect. First of all, I would cite to the statute. That's the first place I'd start. If the statute is clear that it says the court is to decide any issue de novo. Can you tell us what kind of trial you have in mind? What kind of proceeding it would be? Will we have a jury? I don't think it would be a jury, and I think there's some law out there. I think that came up at some point in time. There would be an issue that said a jury wouldn't apply in that type of instance. But I think what you would have is the court would take independent evidence from both parties. Keep in mind the regulation that's in place. What do you mean by independent evidence? Separate evidence from both parties. Evidence from the FDA as well as the manufacturer of the product that's at issue. Did the government just come in and lay down the rulemaking record in its entirety and then say we rest? That's exactly what they've done, without any evidence from the other side. That's the key point there. It's important to recognize that the rule addresses dietary supplements with ephedrine in general. It's not related to a specific product. Well, let's back up. Even if it were de novo, is it your position that our de novo review would be a review of the administrative record? But we would look at it de novo and decide for ourselves and be free to decide it differently from the FDA. Is that correct? You can look at the administrative record. That's correct. But that would not necessarily be all you would look at. Oh, so we would have to open it up to further evidence that wasn't presented before the agency? That's correct, Your Honor. Yep. My time is up. All right. Judge Pollack has a question, so we'll let him ask it and let you be responsive to it, please. My question is a rhetorical one. You say it's correct, but it doesn't seem bizarre. I'm not sure I understand, Your Honor. What are you saying? To contemplate a situation in which the agency has had extended hearings developing, I think, a record of 133,000 pages, and as Judge Smith put it, the government just comes in and says, here's our regulation and here's the record that supports it. Isn't that all the government needs to do? That's certainly the position of the government. I think the key thing, though, is with regard to the 133,000 pages that you referenced, the overwhelming majority of those 133,000 pages were comments and things like that. It's not really the scientific evidence that we're talking about, and the scientific evidence strictly has been presented by the government. It has not been presented by HITECH Pharmaceuticals, my client, which would add a lot. I think when you read through the way the statute reads, it should be that HITECH should get the opportunity to present that information to a court, for a court to decide the issue of the adulteration, which is what I believe the statute says. Judge Pollack used the word bizarre, and your initial reaction was one of consternation. I would use the same word and ask you if it does not seem bizarre in terms of our trying to discern the intent of Congress in the passage of this statute, when it seems to me your position would lead to as many separate de novo proceedings before district courts with consequent inconsistent results, or at the very least, a waste of administrative and judicial resources. Would it not? Well, I would start with the point that that's what Congress said. And if FDA or whoever proceeds that doesn't like the statute, then I would suggest that they should get it changed from the Congressional standpoint. That's what Congress ordered. Well, Congress said de novo review, but speaking only for myself, it seems to me a major thrust, if not the major thrust of this panel's job here, is to determine just what de novo review means. And I think the key thing on that point, if you're looking from the perspective of what Congress intended, Congress intended, they put that provision in there for a specific reason. At the time De Shea, which is the Dietary Supplemental Health Education Act of 1994, was passed, Congress had a great distrust of the FDA. The FDA had been putting unreasonable barriers on the move. We know the history. We know the history. And that's the reason why that statute is there. But Congress didn't say review. The court said the court shall decide any issue under this paragraph on a de novo basis. Well, decide is not a review function. And you're asking that we review it on a de novo basis, don't you? Really, the statute may not really apply, except as we note and have noted in an enforcement action where they come and confiscate your boxes and say these are adulterated. Then you have the right to have that decided de novo, that issue decided. Isn't that different from the court shall review any rule or regulation and the FDA's determination on a de novo basis? I think I would use the word decide to mean determination, which would have to be the court making a determination of what is. To decide any issue is the same as review FDA rule? That's correct, Your Honor. All right. I think we'll hear from you on rebuttal. Thank you. And we'll hear from your colleague. Thank you, Your Honor. Thank you. We don't mean to argue with you, but that's the only way we figure these things out. We understand, Your Honor. Sometimes I mean to argue. Don't be so diplomatic. That's why we call these arguments. That's exactly right. May it please the Court, I'm Ed Novotny, and I'll be addressing some of the other issues, primarily the APA issue, and that is whether or not the FDA followed the APA when it promulgated the rule that's at issue. I'm confused. Certainly. Aren't these all APA issues? Not entirely. De novo, for example, deals with a statutory construction issue totally unrelated to the APA, and that is whether or not high tech is entitled to a trial, notwithstanding the rule, over whether or not its products are adulterated. My issue on de novo. Congress never used the word trial, though. Excuse me? Congress never uses the word trial. No, rarely. In this case, I believe that's what they meant by make a determination. But with respect to the APA, Your Honor, as all of you are aware, Congress requires before an agency promulgates a rule that it publish a notice, and it provides to the citizens of America an opportunity to know what the agency is going to do and to comment on it. In this case, in June 1997, they promulgated, or at least published in the Federal Register, an intent to regulate ephedrine alkaloids. And if you review the notice, nowhere in there does it mention at all that the FDA was contemplating a ban of ephedrine alkaloids. Because of what they were proposing, there was a huge outcry over the lack of scientific basis. In 2000, they withdrew that 97 proposal, except for one provision, and that's the provision on warning labels. How about the 2003 notice? 2003 notice. Doesn't that really mirror the final rule? No, not even close, Your Honor. The 2003 notice primarily addressed that they announced they're going to reopen the 97, but the only thing left to reopen the 97 was the warning label. And if you look at the notice, that's what they addressed, the warning label. They didn't address a ban anywhere in that notice, except in one sentence. And they, again, they're not proposing a rule. They didn't mention adulteration? In the one sentence I'm about to refer to. All right, what does it say? It says, the FDA also intends to consider, to the extent possible, whether in light of current information, FDA should determine that dietary supplements containing ephedrine alkaloids present a significant or unreasonable risk of illness, you know, the adulteration. How does that not suffice? Because it's not proposing a rule. All it's doing is saying, we're thinking about doing this. When Congress passed the SHEA, they specifically told the FDA, if they're going to pass a rule claiming any product is adulterated across the board, they've got to follow the APA. And here's what the congressional notice, excuse me, the congressional record said, what the FDA had to do. First, and it's in the brief, Your Honor, but first, Congress said, proposing to declare adulteration. Second, in so doing, the FDA is required to describe in the notice how such risks are presented with respect to labeling and whether or not there's an alternative to a complete ban. That's not in the 2003 notice either. And third, after they get comments on the proposal, then they can go forward with their rulemaking to ban. And that's in Senate Report 103-410. That is, they were given specific direction how to promulgate a rule regarding a class-wide adulteration of dietary supplements. All they did here is say, we're thinking about doing that. And then they came out with the final rule. Now, is that an alternative to the finding that the final rule is a logical result of the earlier proposed rule? Is that an alternative way to justify or validate the notice? The district court here relied on the opinion of the district court in Georgia, which did find a logical outgrowth. We don't believe a logical outgrowth applies because if you go back and look at the – But is it correct that it's an alternative way of validating? Yes. Yes. Yes, Your Honor. Courts have decided that if, in fact, looking back at the history of the agency's notices, if what ultimately comes out of the regulatory process is something which was a logical outgrowth of what existed previously, they can get away with the lack of adequate notice. But if you go back through these notices, all five of them, in detail, nowhere in those five notices are they following what Congress instructed them to do. And that is, tell us what you're going to ban. Show us how it's risky in light of the labeling requirements. All of DSHEA is governed by labeling requirements. That's one of the hallmark natures of the statute, is that the FDA had to identify, prior to adopting the rule, their proposal, how it related to the labeling, whether there are other alternatives, and then receive comments based on what they're proposing before they pass the rule, promulgate the rule in its final version. Here, the FDA just came out with the rule. After only telling the public, we might consider ephedra and alkaloids to be adulterated. We believe that was not, in any way, shape, or form, a logical outgrowth of what had occurred before. Did you submit comment? We did, but not on the ban. No one submitted comment on a ban. The only comments that we see referring to bans were, like public citizen, people who wanted it banned. But the comment would have to do with whether there was an unreasonable risk of injury. Under conditions of labeling. HITECH's product had very detailed labeling. Warning, if you're obese, don't take this product. If you've got heart failure risks, don't take this product. If you've got all the concerns the FDA had were on our label. What are you saying you would have done differently? We would have probably submitted science showing the benefits, because they did not solicit any benefits in any of the five notices. Now, you're arguing that benefits shouldn't be considered, aren't you? Excuse me? Aren't you arguing that you shouldn't consider the benefits? Oh, yes, yes. But we would have put them in there to try to prevent a ban, even though we didn't know at the time, no one knew they were going to do a risk-benefit analysis. Mr. Novotny, you said it was all limited to labeling. That's not quite true, is it? The FDA spoke of conditions of use recommended or suggested in labeling, or if no conditions of use are suggested or recommended in the labeling, under ordinary conditions of use, doesn't that? That mirrors the statute. It doesn't open the whole horizon to tell us what it's to be for. We'll have to look and see whether there are any situations in which this is not adulterated or doesn't present the unreasonable risk. Right. The language used is a quote from D'Shea as to whether a product is adulterated. You have to look at the product. But if there is no labeling, what's the ordinary conditions of use? Vitamin C may not, but you can't take 50 million grams of vitamin C. That could be risky to you. So they included language that would cover products that don't come with labeling dietary supplements. Ours did. Is it your submission that your client, for instance, didn't know from the notice what the range of issues was that was going to be considered by the agency? Correct. Correct. Not just our client. You were caught unawares. Excuse me? You were caught unaware. Yes. We believe the entire public was. If you look at the correspondence to the FDA after they passed the rule, it was very clear. Enormous numbers of people and businesses were surprised. Are there other suits pending, other forfeitures where you're litigating this around the country? I don't believe we have any more. Pending? No. So you're going to be content with just a couple bites. Yes. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I'm Christine Cole with the Department of Justice on behalf of the Food and Drug Administration. I'd like to address first the race judicata and collateral estoppel issue that we raised in our recent 28-J letter. I would be hard-pressed to come up with a better case in which a claim and issue preclusion should apply. In this case, we have complete identity of parties. We have complete identity of issues. I would invite the Court to look at the brief that HITECH filed in the 11th Circuit case. It's available on Westlaw 2007, Westlaw 4540825. And if you compare the statement of issues, the four issues set forth in their 11th Circuit brief are identical to the four issues, all of which are APA issues that are set forth in their brief in this case. The only difference is that the product, which is identical, both of the products in each case that were seized are their dietary supplements. I think it was Lipidrine. The only difference is there was Lipidrine seized from a place in Georgia, and the Lipidrine that was seized in this case was seized at different boxes. But now, wouldn't this preclusion have existed even after the district court ruling? Well, ordinarily, Your Honor, it is true that race, judicata, and collateral estoppel attach after the entry of a final judgment at the district court level. Notwithstanding an appeal? Notwithstanding an appeal, yes. That's the general rule, Your Honor. However, there is an exception that has been recognized. This is in the restatement, second of judgments, section 13, comment F, as well as section 13 of the restatement of judgments. And it's in comment F. There's also quite a bit of discussion in Moore's federal practice on this point, the exception being that when there is an appeal pending and the review on appeal is de novo, which in this case it was in the court of appeals in the 11th Circuit and it is here. And de novo, I'm not talking about the other de novo issue. I'm talking about de novo review of a grant on summary judgment, de novo review of a statutory interpretation question, et cetera. Right. The appellate standard of review is de novo here. And under this exception on the claim preclusion issue, if review is on appeal de novo, then the time for collateral estoppel or res judicata to attach is after the decision on appeal has been entered. We'll give each of you some time to give us some supplemental briefing on this issue. Okay. And one further point, though, I would like to make on the claim preclusion issue. That also is a matter, and this is widely recognized both in Moore's and Wright and Miller, this is an issue that belongs to the court as well as the parties, if you will. In other words, courts can raise this issue at any time sua sponte because it does bear on the expenditure of judicial resources. Ms. Cole, if you'll permit me one question just before you move on. You said there were different boxes sought by the government for forfeiture. But I want to be sure that I understood your statement. Is it the government's position that the different boxes contained the same substance? Yes, Your Honor. Yes. The same pills, the same drugs? Yes. Not just containing ephedrine, but it's the same product. It's lipidrine and lipidrine and lipidrine. Right. Yes, Your Honor. Yes. Same milligrams. So the only difference would be the container and the quantity. Well, the only difference is the location. We see some boxes containing lipidrine, 25 milligrams with a recommended dosage up to 100 milligrams. From Georgia, there were other boxes of the same product that were seized in Oakmont, Pennsylvania. Same product. Same product. And there's never been any dispute here that it was a different product. Moving to the statutory question of de novo review, in this case, the court asked in your October 15th letter. I'm interested in Hagar. I think that's what you're about to reach. Yes, Your Honor. I'm specifically interested in the Hagar language that says de novo proceedings presume a foundation of law. And I think that's what Hagar stands for. I think that hits the nail on the head, Your Honor. In other words, a de novo proceeding, in any context, whether it's under DSHEA or in any context, the court isn't ever really writing on a clean slate. There is a presumption that there is controlling law out there. Now, in this case, if the FDA regulation is controlling law, in other words, if it's valid, and we certainly believe it is and have defended it as such, then that provides the basis on which the district court decides de novo the questions. But why is the foundation of law not the definition of adulterated? In other words, the law provides adulterated if there is a significant or unreasonable risk of illness or injury. How would we decide that necessarily it's the rule as compared to the statutory language that is a foundation of law? Well, Congress didn't and, in fact, couldn't spell out in greater detail what adulterated means because there are so many potentially different substances out there. That's why it delegated the authority to the FDA to decide that issue based on whatever the particular product or supplement is.  I mean, the history of this entire law is one, and the GAO telling them, I mean, I don't know where the GAO gets the power and authority to say, you know, you really shouldn't be doing this. Look at this again. There's a lot of skepticism about what goes on at the agency. So why wouldn't the de novo concept mean we want the court to look all over again at whether something's adulterated because basically we don't trust you, FDA. We think you're overregulating. Well, first of all, Your Honor, you addressed this in the court's decision in NVE, and you read the de novo provision in the context of the sentence that immediately preceded it, and that's the one that says the United States has the burden of proof in any proceeding. In context, and when you look at the legislative history as to why that burden of proof language was put in there, prior to DSHEA, when the FDA was concerned about the risks presented by a dietary supplement, it didn't have the statutory language it now has. So it used its food additive authority under Section 348 of the Act. The difference was under the food additive provision, it's the manufacturer that bears the burden of proving the safety of its product, and FDA relied on that provision repeatedly, and frankly, it lost repeatedly throughout the courts. This drew the attention of Congress, and that's why Congress, that's one of the reasons that Congress passed DSHEA in 1994 and why it put in both that provision about the burden of proof, and as NVE, as the NVE decision emphasizes, the very next sentence concerning decide de novo was added again at the 11th hour. We don't really know what that means as directly as we do the burden of proof language because the decide de novo language appeared in the statute shortly before it was enacted. There's not a word in any legislative history about that, but again, in NVE, this court found it reasonable to read those two provisions together, and in the context of this history of FDA relying on the food additive provision, which shifted the burden of proof, the intent of Congress was let's change this. Dietary supplements are treated as foods under the statute. There's no pre-marketing approval. Anybody can put anything out there on the shelves. It's only after the hazards and risks are brought to the FDA's attention that it has authority to do anything about it. Yes, John. I don't mean to cut your proposition short, but maybe you can tell me now or a little later. Am I right in understanding that it is the government's position that the de novo language would call for a trial and a determination by the district court of the merits of the government's proposed ban on substances of this kind, that the government would agree that statutory language applies in a situation where there has been no rule?  And the distinction here is that there has been a rule. That's absolutely correct, John. Give me in two sentences or a short paragraph how one writes the opinion which says the de novo language applies in the one instance and not in the other, because I didn't frankly find that in the Eleventh Circuit's opinion. Well, I think the best statement of it is in the District Court of Georgia opinion that the Eleventh Circuit affirmed. There the court concluded, and again, the jumping off point was this court's decision in NVE. In NVE, this court made it clear that insofar as there are APA challenges to what the FDA has done and its adulteration finding, that those are reviewed pursuant to the APA under the arbitrary and capricious standard. What this court left open was the very kind of hybrid proceeding that we have here where there's an enforcement action that's based on a rule. What the district court in Georgia concluded and the Eleventh Circuit agreed is that it would absolutely make no sense at all in a case such as this where an enforcement proceeding is premised on a rule and that rule is determined held to be valid under the APA. It would make no sense and could possibly have been what Congress contemplated to turn around and say, well, if you sever off the enforcement chunk of this case, the court has to redo everything. That just isn't logical. If Congress intended such a dramatic change in the way these kind of regulatory proceedings are litigated, surely it would have spoken more clearly. And that's what Hagar said. That's correct, Your Honor. Congress can do that, but where you are upsetting a long and well-understood tradition of deference to an agency, you better do it with more explicit language. That's correct. And that's why I think the district court in Georgia and the Eleventh Circuit and the district court in this case, which also agreed, basically split the baby properly. The district court in this case did not provide much analysis, however, beyond citing to the Georgia case. Well, in fairness to the district court, she did say that there was really no need to reinvent the wheel here because there were a lot of very thorough decisions. There was the Tenth Circuit decision in nutraceutical, the District of Utah decision in nutraceutical post-remand. There was this court's very thorough decision in NVE, and the extremely thorough decision in the district court of Georgia. So I think it was entirely appropriate for the district court in this case to look at all of that. I believe the district court even did a little research on its own towards the end of the opinion. And just to provide a further backstop, the problem that we would face if we were to find that de novo is a review standard is that there is an arbitrary and capricious standard. So there's a total inconsistency. If we're presented with a rule, one congressional mandate says arbitrary and capricious, another congressional mandate says de novo, what's a court to do? And presumably, we shouldn't read the statute so as to create this result of inconsistency, unless it would just say de novo, notwithstanding anything contained in the APA, the court, et cetera. But it doesn't say that. Your Honor, I think that aptly describes the dilemma here. And I think one of the further problems we have is high tech has repeatedly claimed de novo, de novo. But they haven't really described what that de novo process will look like. They have conceded in their brief that FDA is entitled to rely on its rule and all the evidence. This morning, their counsel talked about presenting additional evidence. Frankly, while that was an issue in the NVE case. I think we foreclosed that already. We said we would do it based upon the administrative record. Exactly. And moreover, I don't recall any place in their brief that they talk about submitting, wanting to submit additional evidence. Moreover, they had five opportunities. There were five solicitations for public comment. Among the 48,000 comments that were submitted to the FDA in this seven-year rulemaking, there were some, I think it's 13,000 comments opposing a ban on ephedra. So the argument that was made this morning by Mr. Novotny, that somehow the public was caught unaware that that's what was on the table in this case, is just simply belied by the record. And we provide the citations in the final rule at page 58 of our brief. Do you agree that the notice is lacking in certain respects? Absolutely not, Your Honor. I can't imagine a notice that would be more comprehensive. In fact, the 2003 notice that was quoted earlier today, it mirrors the rule. The rule itself simply says, dietary supplements containing ephedra and alkaloids present an unreasonable risk of illness or injury at all dosage levels. I'm paraphrasing a little bit there. But if you compare the actual rule that's published in the CFR with what that 2003 notice said, they're identical. And there was plenty of notice even from the outset of this proceeding back in, when was it, 1997 when it started, that a ban was a possibility. That's specifically mentioned in that first notice. And all of this is set forth, the citations to all of the five notices is set forth in our brief. And even if it wasn't that clear, the doctrine of logical outgrowth would certainly encompass this situation. And the NBE decision, again, addressed logical outgrowth, as did the Supreme Court more recently in Long Island Care. That's a well-recognized principle. And there doesn't have to be complete identity. But in this case, I think there was. And the fact that so many thousands of commenters in the public understood that a potential ban of this dangerous product was definitely under consideration, that was well known. All right. Thank you. Thank you, Your Honors. Counsel, did you reserve rebuttal time? I did for two minutes. All right. Thank you. Your Honor, I think the first thing I want to point out is go back to the Hagar question. Because I think you've mentioned this one line in the Hagar opinion about the Chevron deference, about the question here is whether the regulations are part of controlling law. The two sentences prior to that I think are relevant as to the statute that we're dealing with. And I'll just read those. It says, though Congress might have chosen to direct the court not to pay deference to the agency's view, we do not find that directive in these statutes. And then citing Scalia, it says, if Congress had specified that in all suits involving interpretation or application of statute, the courts were to give no deference to the agency's views but were to determine the issue de novo, Chevron deference would be inappropriate. That's this statute. That's what he's talking about. It's a statute that looks exactly like we have here. But what's a court to do? We've got an arbitrary and capricious standard. These two would be totally conflicting. Would they not? Well, I think you're looking at different issues. And that's the reason there's a different standard of review, I believe. You're attacking the rulemaking. You're attacking the rule. You're attacking. They're saying they shouldn't have done what they did. They did it wrong. You look at it anew. But we have an arbitrary and capricious standard, don't we? How do you reconcile that? As to the procedure of implementing that rule, as to the issue of what is being declared adulterated under the statute, I think that's where the court is asking for, that's what Congress is asking for a de novo review of. What is being declared adulterated? Again, you have a situation where the rule is addressing dietary supplements in general and related to that having federal now courts. You know, they made a ruling that specifically says these are adulterated in any way, shape, or form, and you want us to re-look at that issue anew, do you not? You want us to decide that again. That high-tech products are adulterated. That's precisely the de novo determination you want an Article III court to make here, isn't it? Correct. And that the rule made. And we are under an arbitrary and capricious standard to do that. Normally, how do we decide which way to go? Could Congress really have intended us to try to pick one over the other? I think the Congress did intend that, and the reason I say that is because if that's not the case, then Congress's inclusion of putting, number one, the burden of proof on the FDA, and number two, putting this language about the de novo in there, if that's not the situation, then those two provisions really have no meaning. And as we all know, under general rules, Congress says what they mean and mean what they say. Congress put those provisions in there for a specific reason, and it goes back to, in our opinion, it goes all right back to the reason why the SHAE was enacted in the first place. Okay. Counsel, thank you very much. Thank you, Your Honor. I think we will request letter briefs on the issue of the res judicata, and perhaps we ask the government to go first as to why you would be barred. If you could submit something within 10 days, perhaps no more than four pages in a letter brief, and similarly, 10 days after that, if HITECH could respond to that in a similar letter brief, no more than four pages. Does that work, Judge Pollack? That sounds fine to me. I take it the underlying principle is that anything longer than four pages involves an unreasonable risk of confusion. And we stop reading at four. That's what we're doing. We're toying with that with over-length briefs, that you can submit one, but we stop reading at 14,000 words. I mean, that should be sufficient, I would think, to give us. Stop reading at 133,000 pages of transcript. Definitely, if not sooner. Counsel, thank you. The case was well argued. We'll take it under advisement and call our next case.